# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,

v.

Def. ID# 1106025042

RONALD W. WILLIAMSON

Defendant.

## MEMORANDUM OPINION

Court's Decision as to Defendant's Motion to Dismiss. Denied.
Court's Order as to the State's Motion to Involuntarily Medicate Defendant to Restore
Competency – Granted

DATE SUBMITTED: May 20, 2020

DATE DECIDED: May 29, 2020

David Hume, IV, Esq. and John W. Donahue, IV, Esq., Deputy Attorneys General Department of Justice, Georgetown, DE.

Thomas A. Pedersen, Esq. and Michael R. Abram, Esq., Attorneys for Defendant.

**STOKES, R. J.**

FILED PROTHONOTARY
SUSSEX COUNTY
2020 MAY 29 P 12: 08

Defendant Ronald W. Williamson ("Defendant") is charged with two counts of Murder First Degree and numerous additional crimes related to the shooting death of Connie Breeding. Defendant is currently being held for treatment at the Mitchell Unit at Delaware Psychiatric Center ("DPC"). After considering the expert testimony and reports, the Court twice concluded Defendant was not competent to stand trial.[1] In the 2017 proceeding, the State of Delaware ("the State") and the defense conceded that no significant change in Defendant's mental status occurred which would support a conclusion by this Court that Defendant was competent to stand trial. In the hearing and conference concerning the January 2020 proceeding, the State and defense again agreed that under the state of the evidence, Defendant remained incompetent.[2] Thus, the State cannot bear its burden to prove incompetency and, therefore, this Court's previous conclusion will be the same.[3] However, Defendant seeks dismissal of all charges. In addition, the State has requested Defendant be involuntarily medicated to restore competency.

The recent proceedings established that Defendant has not been adequately treated for competency restoration, despite this Court's previous directions that such treatment be administered. However, Defendant has not complied with treatment and has defied any efforts designed to address his delusions and to support a situation where those delusions do not drive his defense.

**Factual and Procedural History**

On June 26, 2011, Mark Anderson, Chief of Police, Greenwood, Delaware, arrived at the scene of a dispute. The dash-cam on the police vehicle, which was running when Chief Anderson arrived, recorded a man later determined to be Williamson. Williamson was holding a woman in

---

[1] *State v. Williamson*, 2013 WL 268981, at *9 (Del. Super. Ct. Jan. 23, 2013); *State v. Williamson*, 2017 WL 6513502, at *1 (Del. Super. Ct. Nov. 28, 2017).
[2] Docket No. 250 3:6-4:17; Docket No. 243 C29, 33.
[3] *Id.*

1

a choke hold and had a hand gun in his other hand. Chief Anderson got out of his car and repeatedly ordered Williamson to drop his weapon. After a slight struggle with his victim, Williamson pointed the gun at her forehead and fired one shot. Williamson immediately dropped the gun and ran into a neighboring residence where he was arrested eight hours later after lengthy negotiations with police officers. The victim, Connie Breeding, died as a result of a single gun shot to the head.

Defendant quickly developed a fixed belief that Dean Johnson, Esquire, one of his prior defense attorneys, participated with the State in altering the police videotape that depicted the crime. The videotape is the central incriminating evidence against him. Defendant's belief that a conspiracy exists to convict him has expanded to include some psychiatrists, medical providers, and the Court. He also has extended delusions, which include alleged tampering with items besides the videotape, such as audio transcripts and personal documents defendant had while incarcerated.[4]

Initially, this Court found defendant competent to stand trial.[5] However, his then counsel sought a reevaluation and a second competency hearing was held on December 14, 2012. In this Court's 2013 decision, the Court concluded Defendant was not competent to stand trial.[6]

---

[4] *State v. Williamson*, 2017 WL 6513502, at *1 (Del. Super. Ct. Nov. 28, 2017).

[5] *State v. Williamson,* 59 A.3d 490 (Del. Super. 2012).

[6] All experts agreed that Defendant had a delusional disorder, which is a serious mental illness, including Andrew W. Donohue, M.D., a forensic psychiatrist from DPC. The Court found Defendant's delusional beliefs impacted eight of the *McGarry* factors and concluded Defendant genuinely holds delusions about falsified evidence and systemic corruption. These are fixed false beliefs and are not manipulative attempts to avoid a murder conviction. These beliefs prevent him from cooperating and communicating with his attorneys. Defense lawyers must provide the best defense consistent with the client's direction. However, in this case, the delusions would infect the process and the trial would be a mockery of justice. The Court will not subject defendant to trial where his psychotic disorder precludes a meaningful defense because a fair trial cannot be had. *State v. Williamson* 2013 WL 268981 (Del. Super. Jan. 23, 2013).

The Court instructed Defendant was to remain at DPC where measures to restore his competency shall be taken.[7] Furthermore, the Court ultimately appointed other attorneys to represent Defendant.[8]

In May 2017, another competency hearing, extending over several days, was held. The following was established. DPC did not undertake any measures to restore defendant's competency other than to allow him to participate in some group activities. Mustafa Mufti, M.D., the Clinical Director of Forensic Services at DPC, testified that he did not see any symptoms, which would call for the administration of psychotropic medications. However, by his admission, he never discussed with defendant the facts of this case in depth. The Court extrapolates from Dr. Mufti's testimony that he never explored defendant's delusions regarding the videotape and the conspiracy theories he held. That would be why he never observed any psychosis. Dr. Mufti diagnosed defendant with Narcissistic Personality Disorder. Dr. Mufti did not medicate defendant because he did not believe defendant had a condition, which required the administration of medication.[9]

The DPC professionals treating Defendant concluded he was competent and that there was nothing they could do for him.

Stephen Mechanick, M.D., again testifying for the State, stood by his diagnosis of Delusional Disorder, Persecutory Type. Dr. Mechanick again concluded that defendant is competent to stand trial. Gregory Saathoff, M.D., a forensic psychiatrist also testifying for the State, concluded that defendant does not suffer from a delusional or other psychotic disorder. Instead, he suffers from a personality disorder with paranoid and narcissistic and borderline

_____

[7] *Id.*
[8] These include the attorneys currently representing Defendant.
[9] *State v. Williamson*, 2017 WL 6513502, at *2 (Del. Super. Ct. Nov. 28, 2017).

3

features. He concluded defendant is competent to stand trial as he is capable of understanding the legal proceedings against him and is capable of assisting attorneys in his defense. Testifying for the defense was Steven Ciric, M.D., a forensic psychiatrist. He diagnosed defendant with a Delusional Disorder, Persecutory Type and concluded defendant's delusional thinking interferes with his competence to stand trial.[10]

After the May hearings, a confidential informant approached the State with the following information. Defendant believes that the videotape is doctored and maintains the man on the videotape does not even look like him. Defendant maintains the Public Defender's office conspired to fabricate the videotape and the Court is trying to protect the integrity of that office. Defendant had also developed a hit list of people he plans to kill if he is released from incarceration. The lists targets individuals associated with his legal proceedings, mental health issues and incarceration.[11]

This information was provided to the testifying experts. The new information did not change Dr. Ciric and Dr. Mechanick's opinions. However, Dr. Saathoff revised his earlier assessment in light of the new information and concluded defendant was not competent to stand trial. Dr. Saathoff was of the opinion that the new information showed entrenched delusions to the extent that defendant has begun to act upon them. The new information also showed that defendant either had hidden his psychosis from his treatment team or his condition has deteriorated.[12]

---

[10] *Id.* at 3.
[11] *Id.* Defendant denies making the list. The information came from an inmate name Jarvis. However, in his September 29, 2017 letter to the Court, Dr. Ciric described the transcript of the interview of Jarvis, as a third party corroboration of what the Defendant has related to Dr. Ciric and the other examiners.
[12] *Id.* at 4.

4

The Court found that between January 23, 2013, and May 2017, DPC did not undertake any measures to restore defendant's competency other than to allow him to participate in some group activities.[13] As a result, DPC was ordered to provide treatment in accordance with the expert opinions and to keep the State apprised of Defendant's treatment.[14]

DPC was directed to provide Defendant with individual therapy which should include monitoring of whether the intensity of his unrealistic beliefs about the videotape being altered is reduced with medication. Individual counseling also should attempt to help Defendant have a more realistic perception of his case and come to terms with the possibility of receiving a sentence that could result in substantial additional time in prison. The professionals at DPC were required to explore the administration of antipsychotic medication and possibly other psychotropic medication. If defendant agreed to their administration, then DPC must administer the appropriate medication. If Defendant refused the medication, then DPC was ordered to notify the State of such refusal and the State was ordered to move for a court order to have defendant involuntarily medicated in an effort to restore his competence so that he may stand trial.[15] Further, DPC was ordered to submit a status report 1) outlining the treatment administered; 2) the results of said treatment; 3) detailing whether defendant's delusions concerning the videotape and any other evidence against him have softened; and 4) assessing the current state of defendant's competency.[16]

When the report was submitted on May 31, 2018, DPC concluded Defendant was not competent for trial, stating Defendant's beliefs have become more deeply entrenched and his theories regarding the conspiracies have expanded. The report explained the Defendant began

---

[13] *State v. Williamson*, 2017 WL 6513502, at *2 (Del. Super. Ct. Nov. 28, 2017).
[14] *Id* at 5.
[15] *Id.*
[16] *State v. Williamson*, 2017 WL 6513502, at *6.

5

believing his phone calls and mail were being tampered with. Defendant expressed his belief that the State was trying to block his phone calls, making his calls go to a "dummy line."[17] The report further stated Defendant believes the legal system has conspired against him to cause Dr. Saathoff to change his opinion and find Defendant not competent to stand trial.[18] Because Defendant's theories regarding a conspiracy against him had expanded and become more entrenched, DPC changed their initial opinion and determined Defendant was not competent to stand trial.[19]

In January 2019, Defendant brought a lawsuit in the United States District Court of Delaware against his previous defense attorney, Johnson, showcasing his disorder. Defendant alleged that Johnson conspired with this Court and Withers to deny him "due process with false accusations of mental illness" and equal protection under the law.[20] He further alleged that Withers "conspired with other Defendants 'to deny due process to Plaintiff's accusations of misconduct by the conspirators actions.'"[21] The suit was determined to be frivolous and dismissed.

Defendant continues with fixed false delusions surrounding the nature of the crime. He believes that his prior defense counsel, the State, and the legal system are involved in a conspiracy to keep him incompetent. Throughout his time at DPC, Defendant has continued to present with delusional ideation.

---

[17] DPC May 31, 2018 Update.

[18] *Id.*

[19] The May 31, 2018 DPC report was signed by three professionals: 1) Dr. Douglas S. Roberts, Psy. D, the evaluating psychologist, 2) Dr. Mufti, the treating psychiatrist, and 3) Dr. Selig, a treating psychologist. Dr. Roberts was the clinical psychologist who found Defendant not competent for trial. As cosigners, Drs. Selig and Mufti joined into the conclusion. *Id.*

[20] *Williamson v. Johnson,* 2019 WL 2745725, at *2 (D. Del. July 1, 2019).

[21] *Id.*

As indicated, Defendant continues to believe that there is a conspiracy against him and that his former public defenders and the police are framing him. His delusions have extended to include DPC staff members. Defendant had been participating in individual therapy sessions with Charlotte Selig, M.D.; however, at one point in their sessions, Defendant fired her, believing that she was a part of the conspiracy against him.[22] Defendant went almost a year without individual cognitive therapy, which had been ordered by this Court.

DPC has provided the Court with copies of the assessments involving Defendant's treatment progress. On the assessment completed for February 2, 2019, DPC noted that Defendant was complying with treatment and the medications seemed to be helping the Defendant. Shortly after, on February 8, 2019, DPC recorded that Defendant had been refusing medications. He had been consistently refusing his medications and on July 16, 2019, DPC recorded Defendant refuses psychotropic medications at that time and continues to have delusions of persecutions and grandeur. There was no further mention of Defendant complying with his psychotropic medications.[23]

Defendant has consistently refused medications and as time progresses, his delusional beliefs continue, extending to include anyone who disagrees with him.

Furthermore, recently submitted documentation and testimony leads this Court to conclude that DPC did not follow the Court's order.[24] DPC was not quick to supply the State with the necessary information to file a motion for involuntary medication.[25]

---

[22] When Dr. Selig attempted to discuss Defendant's belief that she was part of the conspiracy, Defendant became verbally aggressive towards her, cursed at her, and told her he never wanted to see her again.

[23] Dr. Buhler noted in her December 2019 assessment, which was provided to the Court, "Over the course of the winter months, Mr. Williamson continued to express frustrations with his medications. He consistently argued that he will not take medications unless forced, as they have changed him in that he no longer wants to read, play guitar or listen to country music."

[24] State's Mot.

[25] *Id.* at 9.

7

*Most Recent Expert Opinions*

In July 2019, the experts were asked by the Court to address whether (1) Defendant failed to cooperate with appropriate treatment and should be involuntarily medicated and (2) whether DPC implemented a treatment plan to restore competency. Dr. Mechanick provided the below in response:

> It is my opinion that Mr. Williamson has not adequately cooperated with trials of psychotropic medication, as he has declined to try any medication since risperidone was discontinued….Mr. Williamson's DPC treatment plan lists goal #1 as "Mr. Williamson will resolve his legal issues (competency restoration) such that he is able to proceed with his court case." However, treatment notes have not identified any treatment strategy during the past year that would improve Mr. Williamson's competency to stand trial and improve his ability to proceed with his court case….
>
> Based on my review of the updated DPC records and my examination of Mr. Williamson, it is my opinion that DPC has not provided sufficient treatment (as ordered by the Court) to address Mr. Williamson's competency to stand trial.[26]

Dr. Mechanick noted that it is his belief that Defendant has not been compliant and DPC has made an insufficient effort at restoring Defendant's competency.

Dr. Saathoff similarly provided a response. Dr. Saathoff stated as follows:

> [H]is documented statements to the treatment team as well as his statements to me during my 17 DEC 2019 assessment, Mr. Williamson has refused to consider complete trials of psychotropic medication for his delusional disorder. In light of the fact that he has been deemed incompetent to stand trial on the basis of his delusional disorder, and his refusal to voluntarily take appropriate psychotropic medication voluntarily, the next step towards restoration of competency would be medication over objection via court order… Due to his refusal, the many other available antipsychotic medications have not yet been given adequate trials. Because adequate sequential trials of antipsychotic medication have not yet been prescribed, there still remains a realistic potential that Mr. Williamson is restorable to competency to stand trial.[27]

In response to the Court's inquiry, Dr. Ciric provided the following on January 26, 2020:

---

[26] Mechanick's January 7, 2020 Letter.
[27] Saathoff's Janaury 14, 2020 Letter.

Based on this follow-up evaluation, my opinion to a reasonable degree of medical probability is that Mr. Williamson remains incompetent to stand trial, as previously, due to the presence of delusional thinking that is interfering with his ability to rationally understand his legal predicament and assist in his defense; that his treatment plan at DPC is not addressing his primary diagnosis of Delusional Disorder, as had been ordered by the Court, noting that the antipsychotic medication, which I believe is necessary to treat his psychosis; and that without an adequate treatment trial there is insufficient information presently to consider that restoration of competency is unlikely to be achieved in the foreseeable future…

I agree with the other experts that Mr. Williamson has not yet been afforded adequate dose and duration trial of antipsychotic medication to address his Delusional Disorder, that an involuntary medication order is likely needed to achieve this given the defendant's demonstrated refusal of medication at DPC, and that his condition cannot be treated with less intrusive means than medication and stands reasonable chance to improve his psychosis and thereby restore his competency.[28]

All three experts stated Defendant has refused appropriate treatment. They further concluded that Defendant is likely restorable if he receives appropriate medication to treat his delusional disorder.

*January 2020 Hearing*

At the start of the hearing, the defense stated that Defendant would comply with a treatment plan should the motion to dismiss be denied.[29] Thereafter, the Court heard testimony from Dr. Mechanick, Dr. Saathoff, and Dr. Ciric. Dr. Mechanick and Dr. Saathoff testified for the State. Dr. Ciric testified for the defense. In addition, the Court heard testimony from Dr. Mufti, the prior Clinical Director of Forensic Services at DPC. Dr. Mufti treated Defendant prior to his exit from DPC. The Court also heard from Gerard Gallucci, the attending psychiatrist at DPC's Mitchell Unit, and Jennifer Buhler, the inpatient psychologist at DPC's Mitchell Unit, the current DPC professionals associated with Defendant.

---

[28] Ciric's January 26, 2020 Letter.
[29] Docket No. 244 A3:7.

Dr. Mufti saw Defendant on either a weekly or a biweekly basis while treating Defendant. Dr. Mufti testified that Defendant refused medication after having side effects with Risperidone. Dr. Mufti started Defendant on Zyprexa, an antipsychotic medication on December 12, 2017. On December 16, 2017, the medication was discontinued after Defendant complained of side effects. Defendant then began taking Clozapine; however, this was short lived because Defendant required a hospital visit due to what was determined to be side effects of the medication. Dr. Mufti then prescribed Defendant Risperidone.[30] Defendant took Risperidone for approximately one year. Dr. Mufti testified that Risperidone was discontinued after Defendant refused to take the medication.

Dr. Mufti attempted alternatives; however, Defendant refused the alternatives based on his prior experience with Risperidone. Dr. Mufti stated that he would not say medication could not help, however, he feels that he has done all that he can do. Dr. Mufti further testified to Defendant's individual therapy while he was treating the Defendant. When Dr. Mufti attempted to discuss medication with Defendant, he became aggressive and threatening towards Dr. Mufti. Defendant was meeting with the psychologist for individual therapy; however, this too was stopped. Defendant stopped with the individual cognitive behavioral therapy because he did not feel it was helpful. Dr. Mufti provided that Defendant complied with the individual sessions, as Court ordered, until September 11, 2018 when Defendant escalated and stormed out of a session with Dr. Selig. Defendant had no willingness to re-enter therapy. Dr. Mufti left DPC on April 15, 2019.

After Dr. Mufti left DPC, Dr. Gallucci took over the Mitchell unit. Dr. Gallucci began seeing the Defendant in May 2019. Dr. Gallucci sees Defendant on a biweekly basis. Dr.

---

[30] Risperidone is the generic name for Risperdal.

10

Gallucci stated that he does not see Defendant as suffering from a delusional disorder, so he has only discussed taking antidepressants with Defendant.

Although not a forensic expert[31], Dr. Gallucci disagrees with the three specially retained experts' reports. He sees Defendant as having an overvalued idea rather than a fixed delusion. He testified that Defendant has a fixed belief with the videotape but believes it is not "totally fixed." Dr. Gallucci does not challenge Defendant on the specifics of his concern about the videotape. Although Defendant is not wavering on his belief regarding the videotape, Dr. Gallucci testified that Defendant is not as agitated when discussing the tape. Dr. Gallucci further testified that Defendant claims to have evidence regarding the videotape that he refuses to give to his attorneys.

Dr. Gallucci testified that he would have issue with a *Sell*[32] order because he believes antipsychotics will not help and are not for the elderly. If ordered, Dr. Gallucci would not give antipsychotics to Defendant; however, he stated that he would not prohibit another physician from administering the medication.

Dr. Buhler also testified. She is the inpatient psychologist and has been involved with Defendant since February 2018. In September 2019, Dr. Buhler began meeting with Defendant for one on one sessions. Dr. Buhler meets with Defendant once per week for cognitive behavioral therapy. Dr. Buhler testified that the therapy is a "therapeutic alliance" and they focus on frustration tolerance, adaptive coping skills, etc. She also does "supportive listening," which is part of the therapeutic alliance. She further testified that Defendant's belief surrounding the videotape is a fixed belief.

---

[31] Forensic examiners access competency for trial based on the *McGarry* factors. Treatment professionals have a different role akin to that of a doctor and patient. Forensic psychiatry and forensic psychology are subspecialties, which require separate training programs. Docket No. 245 B-29:15-B-31:5.
[32] *Sell v. U.S.*, 539 U.S. 166 (2003).

Although not a forensic expert, Dr. Buhler generally agrees with Dr. Gallucci's viewpoints. Neither Dr. Buhler nor Dr. Gallucci have addressed competency restoration concerns. They are not forensically qualified and do not believe Defendant has a delusional disorder. [33] Consequently, no effective effort was made to address how the delusions affect competency. This is evidenced by Defendant's insistence of fabricated evidence expanding over time, making his defense a product of a delusional mind. To complicate matters, they informed Defendant of their expected testimony before the recent hearing.[34] This alignment is counterproductive to Defendant's ultimate restoration to competency.[35]

Dr. Mechanick concluded that Defendant has a delusional disorder. While Dr. Mechanick maintains his belief that Defendant is competent, he explained that even doctors disagreeing about the disorder could appropriately put personal beliefs aside and work to adequately address how the content of all of the delusions affect competency for trial purposes.[36] Dr. Mechanick reported that Defendant retains the delusional beliefs about the video. Dr. Mechanick believes Defendant is so fixed on his belief that it makes it a delusion. Dr. Mechanick believes "supportive therapy" is not useful for restoring Defendant's competency. Dr. Mechanick stated that, although sufficient in length for the given dose Defendant had, the trial run of Risperidone was not an adequate trial to make a determination. Dr. Mechanick further stated that there has been an absence of efforts to restore competency over the years. Outside of the trial of Risperidone, DPC has made no real attempt at restoring Defendant.

---

[33] *See* Dr. Mechanick's testimony stating one must be informed in forensic psychology to understand the content of the delusions. Docket No. 245 B29:15-B31:5; B14:20-23.

[34] Docket No. 244 A177, 178.

[35] The State has taken steps to put a forensically qualified team in place to forensically attempt to restore competency and agree Gallucci and Buhler not be further involved. Docket No. 250 7:17-20.

[36] Docket No. 245 B19:22 – B20:5.

Further, Dr. Mechanick opined that Defendant's treatment would require a "belt-and-suspenders" approach, testifying, "the medication may help him to realistically consider his options and the therapy may help him to more realistically consider his case. So the two, one can assist the other and there are articles that suggest that delusional disorder…can be assisted with medicine."[37] When asked whether the *Sell* factors have been met, Dr. Mechanick responded, "I believe so. I think that there is sufficient probability of response to medication that would warrant involuntary treatment, if necessary, to help Mr. Williamson's competency to improve."[38] Dr. Mechanick testified that Defendant suffers from a delusional disorder and can improve with the administration of antipsychotic medication together with individual therapy with forensically qualified professionals.

Dr. Saathoff maintains his belief that Defendant is incompetent.[39] Dr. Saathoff believes the *Sell* factors have been met. Dr. Saathoff believes Defendant suffers from a delusional disorder. Dr. Saathoff believes medication would be helpful in treating Defendant's delusions and Defendant has not received an adequate trial. In addition to medication, Dr. Saathoff believes individual therapy and behavioral therapy designed to restore competency would help Defendant. At this point, Dr. Saathoff stated that he does not believe there are less intrusive methods than forced medication.

Dr. Saathoff disagrees with Dr. Gallucci's belief that there is no research pertaining to medications being appropriate to treat Defendant. Dr. Saathoff testified there is research that delusional disorder will likely respond to treatment of antipsychotics. Professional materials were introduced in support of this opinion, including one report that found a substantial success

---

[37] Docket No. 245 B32.
[38] *Id.* at B42:19-23.
[39] Saathoff January 13, 2020 Letter.

rate in the treatment of delusional disorder.[40] Dr. Saathoff further stated that there are newer antipsychotic medications that have less side effects and would be more tolerated.[41]

Dr. Ciric believes the Defendant is incompetent for trial purposes. He believes the *Sell* factors have been met. Dr. Ciric believes Defendant suffers from a delusional disorder, persecutory type.

Dr. Ciric also believes Defendant lacks rational and factual understanding of proceedings to assist counsel rationally.[42] Dr. Ciric believes DPC has failed to try to restore Defendant and has not addressed competency restoration. Dr. Ciric believes, in accordance with the other expert's opinions, antipsychotics would be useful in treating Defendant's delusional disorder.

## Discussion and Order

### *Motion to Dismiss*

Defendant moves for dismissal, arguing that the State has had more than a reasonable amount of time to attempt to restore Defendant to competency. Defendant contends that the charges pending against him should be dismissed as a violation of his right to a speedy trial and equal protection under the law. Determining whether a defendant's speedy trial rights have been violated, the Court utilizes the four factor test established by the United States Supreme Court in *Barker v. Wingo*.[43] The four factors are: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant.[44] The Defendant filed the motion to dismiss on December 8, 2017. Given the delay, there is prejudice to

---

[40] State's Exs. 11 & 12, *Sells* Hearing, *State v. Williamson* (Jan. 28, 2020).

[41] Saathoff January 13, 2020 Letter.

[42] Dr. Ciric believes Defendant continues to suffer from delusional disorder, persecutory type, with a fixed false belief system pertaining to the conspiracy against him and cannot rationally assist his counsel at trial. Ciric January 26, 2020 Letter.

[43] 407 U.S. 514 (1972); *See State v. Draughn*, 2016 WL 7105933, at *5 (Del. Super. Ct. Nov. 29, 2016).

[44] *Id.* at 530.

14

Defendant by the length but not from the loss of evidence that is not compromised by the delusional disorder.

When the Court is satisfied that an accused person is unable to understand the nature of the proceedings or assist on their own behalf, the Court may order the accused to be treated at DPC until the accused person is capable of standing trial.[45]

Defendant was found incompetent because of his delusions, which would make a mockery of justice should trial proceed. Defendant continues to maintain the same delusional beliefs about the videotape and the alleged conspiracy against him. Presently, these delusions have expanded. The State and defense counsel agree that Defendant continues to remain incompetent to stand trial. Defendant's defenses would be the product of his delusions. Notwithstanding the change of defense counsel, there has been scant progress restoring Defendant to competency so he may stand trial.

The United States Supreme Court has held that "... a person charged by the State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future."[46] "[W]hat constitutes a 'reasonable period of time' is a fact-sensitive analysis that will vary greatly from case to case."[47]

---

[45] 11 *Del C.* § 404(a) states in pertinent part:
    (a) Whenever the court is satisfied, after hearing, that an accused person, because of mental illness or mental defect, is unable to understand the nature of the proceedings against the accused, or to give evidence in the accused's own defense or to instruct counsel on the accused's own behalf, the court may order the accused person to be fined and treated in the Delaware State Hospital until the accused person is capable of standing trial....

[46] *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

[47] *State v. Draughn*, 2016 WL 7105933, at *4 (Del. Super. Ct. Nov. 29, 2016).

Defendant continues to be found incompetent; however, Defendant continues to remain incompetent in part because he has not wholly received the restoration treatment recognized by the three experts because of his refusal to cooperate.[48]

Defendant has been aggressive and inconsistent with his desire for treatment. Defendant has refused to work with individuals at DPC and has refused medications over the course of his incarceration. Defendant's noncompliance has continued to be an issue in his treatment. Dr. Mufti had switched Risperidone to the dissolvable form to ensure Defendant's compliance; however, Defendant is no longer taking Risperidone due his refusal. Dr. Mufti attempted alternatives but Defendant refused.

Defendant cites to *State v. Goldsberry* in support of his motion. In *Goldsberry*, the court held that 11 *Del.C.* § 404(a) "does not permit an incompetent criminal defendant to be held indefinitely while awaiting a return to competency."[49] However, the court determined that the defendant's commitment was reasonable because the treating physician entertained the possibility that the defendant's competency could be restored.[50] Similar to the circumstances present in *Goldsberry*, the retained experts opined that Defendant, with proper medication and therapy, could become competent to stand trial.

Defendant also cites to *State v. Draughn*. In *Draughn* the defendant moved for dismissal arguing that his confinement, in light of the State's inability to restore him to competency, subjected him to a *de facto* life sentence.[51] The court reasoned that the delay was due to the defendant's behavior.[52] The defendant had been prescribed antipsychotic medication; however,

---

[48] All three of the retained experts believe there is a reasonable possibility that Defendant can be restored to competency if he receives the appropriate treatment.
[49] *State v. Goldsberry*, 2000 WL 710090, at *3 (Del. Super. Ct. Apr. 26, 2000).
[50] *Id.*
[51] *State v. Draughn*, 2016 WL 7105933, at *5.
[52] *Id.*

16

he refused to take it. The Court finds Defendant's present circumstance strikingly similar to that of the defendant's in *Draughn*. Defendant has refused to take medication and has been aggressive towards DPC staff. Defendant's failure to participate in his restoration of competency is the primary reason Defendant has yet to be found competent and remains at DPC.

The DPC records demonstrate an ongoing refusal by Defendant to comply with medication and individual therapy. Balancing the four *Barker v. Wingo* factors, Defendant significantly caused the extended delay, which outweighs the other points.

*Motion for Involuntary Medication*

As it has already been determined, Defendant has been noncompliant with taking medication to restore him to competency. The State has filed a motion to have Defendant involuntarily medicated and this Court heard testimony over a three-day hearing from the staff at DPC and experts retained by the State and defense.

In *Sell v. U.S.*, the United States Supreme Court addressed involuntarily medicating a defendant to restore competency.[53] "*Sell* established four questions that must be analyzed before a court can order involuntary medication to restore competency: (1) is there an important governmental interest at stake, (2) will administration of involuntary medication significantly further those concomitant state interests, (3) is involuntary medication necessary to further those interests and are less intrusive treatments unlikely to achieve substantially the same results and (4) is administration of the drugs medically appropriate?"[54]

The Court finds that the State has an important government interest at stake – the continued prosecution of Defendant. Defendant faces serious charges, including Murder First

---

[53] 539 U.S. 166 (2003).
[54] *State v. Draughn*, 2016 WL 7105933, at *6 (Del. Super. Ct. Nov. 29, 2016) (citing *Sell v. U.S.*, 539 U.S. 166 (2003)).

Degree. Should there be a conviction, he faces life imprisonment. Defendant is on video shooting his victim and attempting to wound the responding officer. In addition, Defendant has made threats towards those he believes to be a part of the alleged conspiracy against him. The governmental interest surely includes protecting the public by incarcerating Defendant, promoting the respect for law, and imposing just punishment for an offense.

Defendant has exhibited aggressive and threatening behavior over the course of his time at DPC. He has threatened DPC staff members, including the dietary staff, stating "I can't wait to burn your ass" and "I got no fear of you."[55] When eggs were not given at breakfast, Defendant became agitated and verbally threatening.[56] When his psychiatrist discussed medication with Defendant, he became aggressive, pounding the table, and stated he would "bite" someone.[57] Furthermore, an informant provided the State with information that Defendant has a "hit list" including those who Defendant believes has wronged him. Dr. Saathoff noted in his January 13, 2020 report that Defendant "spoke about killing those who did not believe him…."[58] Defendant continues to be a danger to others and becomes aggressive and threatening towards anyone who disagrees with him.[59]

In February 2017, the Court received a letter from DPC requesting the immediate transfer of Defendant from DPC to the Department of Correction due to safety concerns related to Defendant's dangerousness towards others. The Court was notified that Defendant was making threats regarding instigating a riot following the riot/hostage situation that took place at James T.

---

[55] DPC April 11, 2018 progress assessment.
[56] DPC April 18, 2018 progress assessment.
[57] Ciric January 26, 2020 Letter.
[58] January 13, 2020 Letter from Saathoff, at 7.
[59] *See* Mechanick September 21, 2017 Letter at 3 ("Mr. Williamson's homicidal statements, as reported by Mr. Jarvis, indicate that Mr. Williamson is an ongoing danger to others, and that there is a risk that Mr. Williamson would harm and/or kill other people if he were released from prison").

Vaughn Correctional Institution.[60] Defendant's threatening and belligerent behavior caused DPC to seek having Defendant immediately transferred from their care.[61]

The Court also finds that the administration of involuntary medications will significantly further the governmental interests. If Defendant is not restored to competency, the State will have to dismiss the charges.

All three experts opined that antipsychotics were necessary and effective in treating Defendant's delusional disorder. Dr. Saathoff testified that he believed there were no less intrusive methods than forced medication at this point.[62] Likewise, Dr. Mechanick believes there is sufficient probability of response to medication that would warrant involuntary treatment, if necessary, to improve Defendant's competency.

Further, the medication is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel at trial. Although Defendant reported Risperdal made him disinterested in the hobbies he traditionally enjoyed doing, – not a side effect that would hinder his ability to assist counsel – Dr. Saathoff stated there are multiple medications that would likely to lead to restoration of competency with safer and fewer side effects.[63] At the January 2020 hearing, all three experts opined there are multiple medications that have not been tried which would help Defendant's restoration of competency and produce few side effects.

Defendant has demonstrated a need for involuntary administration of medication. In her December 12, 2019 assessment of Defendant, Dr. Buhler stated, "[Defendant] consistently

---

[60] Defendant stated "[DPC staff] need to stop f—g with us or I'm going to start a f—g riot in here like they did in Smyrna last week." DPC February 14, 2017 Letter.
[61] *Id.*
[62] Docket No. 245 B100:5-16.
[63] Saathoff January 13, 2020 Letter.

19

argued that he will not take medications unless forced, as they have changed him in that he no longer wants to read, play guitar or listen to country music." Based on the whole record, the Court concludes that involuntary medication is necessary in restoring Defendant's competency.

Lastly, the Court concludes the administration of the drugs is medically appropriate and in Defendant's interests to be restored to competency as he desires. Testimony provided by the retained experts demonstrate a viable and medically appropriate treatment option for Defendant. Dr. Saathoff testified there are multiple medications that would be helpful in treating Defendant's delusions.[64] Although Dr. Saathoff recognized that Defendant indicated there were side effects while on prior prescribed medication, Dr. Saathoff testified there are other medications that could be more tolerated. Several of Defendant's complaints do not appear to be objectively related to prior medications.[65] Dr. Ciric also testified that he believes, based on modern literature, antipsychotics would be useful in treating Defendant's delusional disorder.[66]

After reviewing the materials and listening to the testimony provided by the experts for both the State and defense, the Court finds Defendant has not complied with efforts to restore competency. The experts opine Defendant's competency is restorable with an appropriate trial of antipsychotic medications; however, he has consistently refused medication. As a result, the motion to dismiss is denied without prejudice. The State's motion for involuntary medication is granted. All three experts agree Defendant suffers from a delusional disorder that is treatable by the use of medications. At the most recent hearing, defense counsel represented Defendant's desire to be declared competent and, therefore, is willing to take medication in order to try to

---

[64] Docket No. 245 B100:5-16.

[65] Dr. Mechanick testified Defendant's reported side effects, based on the record, appear to be subjective and are either "magnified in his mind or aren't really substantial issues." Dr. Mechanick further stated, "when he reports having like 30 or so side effects that are on a medication sheet, it's not likely that he had all of those from a single medicine." Docket No. 245 B52:6-16. *See also* State's Ex. 3, *Sells* Hearing, *State v. Williamson* (Jan. 28, 2020).

[66] Docket No. 243 C14:4-10.

achieve competency.[67] However, if Defendant's refusal to comply leaves no less intrusive method to restore competency, he shall be involuntarily medicated.

The Court is mindful that Defendant has been held for over eight years; however, as discussed, Defendant has been noncompliant with treatment, which overrides DPC's failure to administer appropriate treatment as ordered by this Court in 2017. The State is taking steps to have an independent psychiatrist and psychologist treat the Defendant collaboratively who are forensically trained to assess trial competency.[68] From the information presented by the State, these persons have special training and experience concerning the appropriate dose(s) and type of medication(s) to successfully treat Defendant while avoiding unnecessary or harmful side effects.

The State will submit a status report 1) outlining the treatment administered; 2) the results of said treatment; 3) detailing Defendant's medication regimen; 4) any adverse medication side effects with ameliorative steps taken; 5) Defendant's level of cooperation with medication and treatment; 6) detailing whether Defendant's delusions concerning the videotape and any other evidence against him have softened; and 7) Defendant's prognosis for competency restoration under the *McGarry/Shields* factors.[69] The Court is aware of the current obstacles the recent health emergency has brought on. Therefore, the status report must be provided no later than six months following the start of treatment by the independent treating psychiatrist and psychologist, and every 90 days thereafter, pending further order of the Court. The State shall notify the Court

---

[67] Docket No. 244 A3:7.

[68] Docket No. 242 and 247; Docket No. 250 7:17-20.

[69] The *McGarry* criteria are "known as the Competency to Stand Trial Instrument" and are a "widely used assessment procedure in the area of competency to stand trial." *State v. Shields*, 593 A.2d 986 (Del.Super.1990); *Feliciano v. State*, 157 A.3d 1235 (Del. 2017).

when Defendant's treatment begins. If Defendant is not found to be competent for trial within a year from the commencement of treatment, the State will need to dismiss the charges.

**IT IS SO ORDERED.**